IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
Delta Division

UNITED STATES OF AMERICA                    )
                                            )
                                            )   No. 2:23-CR-0001-DPM
v.                                          )
                                            )
                                            )
THOMAS DAVID CARRUTH                        )

**UNITED STATES' SENTENCING MEMORANDUM**

The United States of America, by and through the undersigned prosecutors, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons expanded on below, the government requests that this Court sentence Defendant Thomas David Carruth to 18 months of imprisonment, followed by one year of supervised release. The government's recommended sentence constitutes a significant upward variance from the top of Carruth's Guidelines range, estimated to be 6 months of imprisonment. But his decades of abuse of authority, his ardent refusal to accept an ounce of responsibility for his misconduct, and his abhorrent behavior during trial—demonstrating a lack of respect for the law, the proceeding, and this Court—warrant a sentence of 18 months' incarceration.

## I.      Factual Background

The Court, having presided over Carruth's jury trial, knows the facts here well. The government will therefore limit this background section to a summary of the facts most pertinent to the government's recommendation, including certain facts that were not brought to light during trial for fear of prejudice to Carruth.

**A. Carruth's History of Abuse**

For much of his legal career, Carruth has held positions of great authority in Monroe County, be it his many years operating as a solo-practitioner, helping Monroe County citizens at some of their lowest points; his eight years as a deputy prosecutor; or his eleven years on the bench as the elected-district judge. And throughout his career, Carruth has repeatedly abused that power for his own sexual gratification.

Carruth's pattern of abuse were first brought to light in 2018 by Arkansas's Judicial Discipline and Disability Commission (JDDC). The JDDC, over the course of a year-long investigation, interviewed many women who had witnessed Carruth's abusive conduct or were otherwise personally victimized by it. Here are several examples alleged by the interviewees:

- C.K. described how when Carruth was a prosecutor, he called her to tell her that she was set to be charged with multiple crimes. Gov. Sent. Ex. A at 8–9. He told her that if she scratched his back, he could scratch hers. He explicitly told her he had sex in mind. *Id.* at 9. This kind of offer happened more than once, including after Carruth became a judge. *Id.* at 12–14.

- T.B. described how when Carruth was a solo-practitioner, he provided her with legal advice regarding her divorce. Gov. Sent. Ex. B at 1. On one occasion at Carruth's office, he presented her with a plan that would allow her to pay off her legal bills: after obtaining a health certificate verifying that she had no sexual diseases, she would attend swinger parties with him in Little Rock. *Id.* He concluded his offer by unzipping his pants and exposing himself to her, telling her, "this is what you will have to work with." *Id.*

- K.S. described how when her case was pending before Carruth, he tried to get her to come to his house to help "clean," and told her that if she scratched his back, he would scratch hers. Gov. Sent. Ex. C at 30. K.S. reported that Carruth repeatedly made advances on other female litigants, encouraging them to meet him on back gravel roads or his home to perform sexual favors in exchange for lenient treatment. *Id.* at 43.

- S.K. described how after thanking Carruth via text for sentencing her niece to community service in lieu of a fine, Carruth responded that her niece would not have had to do community service if she had come by his office to "show [him] some appreciation." Gov. Sent. Ex. D at 5. Carruth also allegedly texted S.K.'s

2

sister-in-law, another defendant appearing before Carruth, that he could make her case go away if would come by his office at night. *Id.* at 7.

The FBI interviewed each of the above-referenced witnesses, and each recited the same facts that they had told the JDDC.[1]

On November 18, 2018, the JDDC issued Carruth a letter of admonishment, concluding that from 2013 to 2017, Carruth had ex parte contacts with litigants and witnesses with cases pending in his court. *See* Gov. Sent. Ex. E at 3. The JDDC determined that those contacts violated several rules of the Code of Judicial Conduct by creating an appearance of impropriety that undermined the independence, integrity, or impartiality of the judiciary. *Id.* The JDDC also determined that Carruth did not take any corrective action that is expected of judicial officers until he received the complaint from the JDDC. *Id.*

### B. Carruth's Meetings with Courtney Mason

The JDDC's investigation and letter of admonishment did not deter Carruth. In April 2022, he had a series of meetings with Courtney Mason—the then-girlfriend of a defendant appearing before him, Robert Sullins—in his office. During the first meeting on April 14, 2022, they discussed Sullins' case and what Mason could do for Carruth in exchange for him helping Sullins. Carruth specifically stated that he would need something from Ms. Mason of equal or greater value to his life and career to ensure Mason's silence.

They met again four days later on April 18. Anticipating, based on Carruth's notorious reputation around town, that Carruth would make a sexual advance on her during their second meeting, Mason recorded it on her phone. During that recording, Mason provided a list of her previous crimes to Carruth, hoping it would serve as enough collateral to convince Carruth that she

---

[1] An FBI case agent will be available to testify at the sentencing hearing on this point.

would stay silent. Carruth assured her that he would keep the list of crimes in his private safe and type it up into an affidavit for her to sign. But it became immediately evident that the list of crimes was not the exchange Carruth had in mind: he wanted sex, or, as a plan B, a sneak peek of her body. Mason said no to both advances and left his office, hoping that the list of crimes would still satisfy Carruth in the end.

Over the next several days, Mason sent a series of texts to Carruth inquiring about the status of Sullins' case. Those texts grew increasingly exercised. At one point Mason stated that if she needed to give Carruth more incentive to help Sullins, she would.

As shown by their text exchange, Mason and Carruth met for a third time on April 24, 2022. And Mason testified at trial, during that third meeting, Carruth warned Mason that he had beaten allegations of misconduct before and would do what he needed to do to protect himself. He nevertheless assured Mason that he would still do what he could to help Sullins.

The next day, Mason texted Carruth to inform him that she had a 28-minute recording of their April 18 meeting. She asked whether Carruth would do the right thing in the face of that recording. Carruth responded that he would do the right thing, and that everyone would lose as a result.

A day later, on April 26, 2022, Mason contacted the Monroe County Sherrif's Office to inform them of the April 18 recording. She was immediately referred to the Arkansas State Police and then, finally, to the FBI. With hesitation, Mason turned over both the April 18 recording and her text messages with Carruth to the FBI.

On April 28, 2022—ten days after Mason provided him with the list of her crimes—Carruth contacted the Arkansas State Police to give them that list of crimes. Carruth, feeling the walls

closing in around him, informed the Arkansas State Police that Mason was likely going to report him for sexual advances.

On May 2, 2022, Carruth met with several FBI agents to discuss the complaint he sought to file against Mason. During the meeting, despite acknowledging that lying to federal agents is a federal crime, Carruth denied ever asking Mason for sex or offering it, denied ever thinking about having sex with Mason, and stated he was unwilling to have sex with Mason. He never once stated or even hinted at what became his defense at trial: that he was investigating Mason for attempted bribery.

### C.  Search Warrants

In June 2022, the FBI executed a search warrant for Carruth's home, office, and devices. In the course of the search, the FBI recovered a draft affidavit, written by Carruth, listing Mason's crimes. And on his devices, the FBI found several recordings of Carruth's stepdaughter in her bedroom and bathroom in Carruth's home. In the video from the bathroom, Carruth can be seen positioning the camera. In both recordings, his stepdaughter is nude.[2] The FBI also recovered many text message exchanges between Carruth and a city employee who reported to him directly. Those text messages were extraordinarily sexual and included nude images. Gov. Sent. Ex. F.[3]

### D.  Trial

The jury trial in this case spanned one week. Throughout the trial, Carruth was—to put it mildly—disruptive, disrespectful, and combative. That behavior, as perhaps to be expected, was

---

[2] Defense counsel has seen both of these videos at the FBI. Upon request, the government will make them available to the government and the Court. Alternatively, the FBI case agent is prepared to testify regarding the contents of the videos at trial.

[3] Exhibit F does not contain all of the text messages recovered between Carruth and the city employee. But defense counsel is in possession of the full exchange and the government is happy to send the full exchange to the Court on request.

often directed at government counsel. For example, Carruth audibly said "fuck you" during

government counsel's closing argument, as witnessed by a member in the audience. But neither the

Court nor defense counsel was spared from Carruth's ire. These outbursts, aimed at all parties,

required the Court to admonish Carruth several times.

Most concerningly, during his multi-day sworn testimony, Carruth repeatedly and provably

lied on the stand:

1. On April 18, 2022, Carruth texted Mason to say that there would be "More, much more risk" in meeting the next day rather than that same evening. *See* Gov. Trial Ex. 19. At trial, Carruth explained that text away by stating that he was concerned about having to speed back to Clarendon from a track meet in Mississippi, risking a speeding ticket. *See* Aug. 28 Trial Tr. at 38. But in the text messages, Carruth had stated that he was in fact in Marvell, Arkansas. *See* Gov. Trial Ex. 19. Carruth's explanation for what he meant by "More, much more risk" was pure fabrication.

2. Carruth's testimony regarding his April 18, 2022 meeting with Mason—which was *recorded* and played repeatedly during Mason's testimony preceding Carruth's—was riddled with false statements. For example, the recording starts when Ms. Mason exits her vehicle and ends when she exits Carruth's office. That said, to somehow legitimize the meeting, Carruth falsely stated that they had discussions about the pending adoption that did not appear on the recording. *See* Aug. 28 Trial Tr. at 38–39.

3. Carruth also testified that "there are two judges in this courtroom right now. Judge Marshall . . . and me. I still hold the title of judge. I've not been removed as a judge." *Id.* at 40. To the contrary, Carruth, via letters to the Mayors of Clarendon and Holly Grove, resigned from his position as a District Judge in order to run for the office of City Attorney. *See* Gov. Sent. Exs. G (Letter to Mayor of Clarendon) and H (Letter to Mayor of Holly Grove).

4. As to the April 18 meeting, Carruth testified that he "tried to whatever [he] could to make [Mason] understand don't come back in here, but she does anyway." Aug. 28 Trial Tr. at 46–47. In reality, the text messages show that Carruth was an equal and willing participant in the scheduling of a time to meet on April 18. *See* Gov. Trial Ex. 17–20. In fact, he was the one who suggested they meet on April 18 instead of April 19. *See* Gov. Trial Ex. ("Unless you want to do it today").

5. Carruth testified that after the meeting on April 18, he did not meet with or correspond with Mason again. Aug. 28 Trial Tr. at 56–57. His text messages

prove that was a lie. He initiated a text message with her again on April 23. Gov. Trial Ex. 21. In that exchange, he said that he could meet with Courtney on April 24 or 25. Gov. Trial Ex. 22. The next day, on April 24, he asked Mason if she could meet at his office at 7:30 p.m. Gov. Trial Ex. 23. She said yes. *Id.* The text messages support Mason's testimony that they did in fact meet that evening and belie Carruth's testimony that they did not.

6. Carruth testified on cross-examination that the April 18, 2022 recording of the meeting between him and Mason was "not what took place." Aug. 28 Trial Tr. at 73. That was simply a lie designed to cause doubt among the jury. Carruth admitted to and explained away much of the tape's content during his direct examination.

7. Carruth testified on cross-examination that he did not take notes during the April 18, 2022 meeting. Aug. 29 Trial Tr. at 117. Those notes were admitted as an exhibit, Gov. Trial Ex. 48, and, as defense counsel noted, Carruth had personally reviewed the notes pretrial.

On August 30, 2024, a jury convicted Carruth on one count of making false statements, in violation of 18 U.S.C. § 1001 (Count Eight). The maximum term of imprisonment is five years. 18 U.S.C. § 1001(a)(2). The jury acquitted Carruth of all charges of bribery, honest services fraud, and violations of the Travel Act (Counts One through Counts Seven). A sentencing hearing is scheduled for May 19, 2025.

## II.   Sentencing Guidelines

As this Court is aware, although the federal Sentencing Guidelines are merely advisory, the Court is still required to consult the Guidelines and take them into account during sentencing. *United States v. Booker*, 543 U.S. 220, 264 (2005). The Supreme Court has directed that district courts "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). A sentencing court should first calculate the range prescribed by the Sentencing guidelines after making the appropriate findings of fact. *Peugh v. United States*, 569 U.S. 530, 541 (2013). But the sentencing court "may not presume that the

Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). The "Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49.

### A. Guidelines Disputes

The government has reviewed the Presentence Investigation Report (PSR) and the computations of the United States Probation Officer (USPO). As to the Guidelines analysis, the government believes there is two areas of dispute: the applicability of the position of public trust enhancement (U.S.S.G. § 3B1.3) and the applicability of the obstruction enhancement (U.S.S.G. § 3C1.1). The government will briefly address why each apply.

#### a. *Abuse of Public Trust Enhancement*

The Sentencing Guidelines provide for a two-level offense enhancement when a defendant has "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Thus, the "enhancement applies only where the defendant has abused discretionary authority entrusted to the defendant by the victim." *United States v. Trice*, 245 F.3d 1041, 1042 (8th Cir. 2001) (citation omitted).

Here, Carruth no doubt held a position of public trust as an elected district court judge. *See* U.S.S.G. § 3B1.3 cmt. n.1 (defining a position of public trust as "characterized by professional or managerial discretion"). And he used that position to lure in Mason and to purchase credibility with the FBI agents when he opted to throw Mason under the bus. As Carruth said during trial, he did not bother to record his interactions with Mason because he believed that as a district judge, he would be believed over Mason by law enforcement and the broader Monroe County community. *See* Aug. 29 Trial Tr. at 157. That the FBI agents in this investigation, having already listened to the April 18 recording, knew that Carruth was lying to their faces is of no import. Carruth used his position of power to make sexual advances against Mason and then attempt to have the FBI believe

his story over hers on perceived credibility alone. That was an abuse of his authority entrusted to him by the people of Monroe County. The abuse of trust enhancement should thus be applied here. *See e.g.*, *United States v. Bresnahan*, 400 F. Supp. 3d 793, 797 (D. Minn. 2019) (applying 3B1.3 where a probation officer defendant lied to FBI agents regarding sexual misconduct).

### b. *Obstruction Enhancement*

Under U.S.S.G. § 3C1.1, a two-level increase is applied where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." Relevant here, "[c]ommitting perjury at trial constitutes an obstruction of justice within the meaning of § 3C1.1." *United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2004). In assessing whether the enhancement applies, the sentencing court must "conduct an independent evaluation and determine whether the defendant committed perjury." *Id.* (quotation omitted). "A witness commits perjury when he testifies falsely under oath about a material matter with a willful intent to deceive the fact finder." *United States v. Abdul-Aziz*, 486 F.3d 471, 478 (8th Cir. 2007) (quotation omitted). Under the Guidelines, "material" means "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 cmt. n.6.

As the government illustrated above, *see* Section I.D.1–7, there are at least seven instances of perjured testimony from Carruth during trial. Carruth's testimony was, more often than not, preposterous and lacked a basis in reality. Will we never know how much of that false testimony and confusion influenced the jury's decision.

And there is no doubt that Carruth's lies were willful rather than the result of confusion, mistake, or faulty memory. He was once a licensed attorney, a prosecutor, and a district judge. As Carruth testified, "[w]e lawyers make our living asking words and using phrases the right way."

Aug. 28 Trial Tr. at 50. That is what transpired during trial—Carruth spun an elaborate tale and told lie after lie to reinforce it. The obstruction enhancement should thus be applied.[4]

## B. Guidelines Calculation

The parties agree that Carruth's base offense level is 6 (U.S.S.G. § 2B1.1(a)(2), that he should receive the zero-point offender downward-adjustment of 2 points (U.S.S.G. § 4C1.1(a) and (b)), and that his criminal history category is I. Thus, no matter how the Court rules on the position of public trust and obstruction enhancements, Carruth's advisory Guidelines range is 0 to 6 months' incarceration.

## III.    The Section 3553(a) Factors

Together with considering the Guidelines' recommended sentence, the Court must also consider the 18 U.S.C. § 3553(a) factors. Those factors guide the Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth in the statute, *i.e.*, most relevantly, to account for the nature of the offense and history and characteristics of the defendant; reflect the seriousness of the offense; to promote respect for the law; and to provide just punishment for the offense; and to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(A)–(C).

Under any circumstances, the offense for which Carruth was convicted constitutes a serious crime. But in this case, the offense is particularly egregious given Carruth's position of authority, his motives, the manner in which he committed the crime, the potential consequences of that crime, and his attempt to cover it up while on the stand under oath. Accordingly, and as discussed further

---

[4] The government believes the witness intimidation allegation referenced in paragraphs 25, 29, and 36 to be credible. Still, the witness no longer wishes to play a role in this sentencing for his/her mental health and does not wish to testify or write a letter in support of her claim. The government therefore relies solely on Carruth's perjury at trial in support of the obstruction enhancement.

below, consideration of the factors in 18 U.S.C. § 3553(a) weighs heavily in favor of a term of imprisonment. More specifically, the factors favor an upward variance

### A. The Nature of the Offense and The History and Characteristics of Carruth

The Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

To state the obvious, Carruth was a sitting judge for the State of Arkansas when he committed the offense of conviction. It was his job, his duty, and his obligation to follow the law and dispense justice fairly. Carruth's conviction represents a betrayal of the public trust and stamps a substantial black mark on every case he has touched. And his pattern of misconduct relating to and underlying the count of conviction and his motives for the same underscore the serious nature of his crimes and the need for more than a slap on the wrist, *i.e.*, a probationary sentence.

The government recognizes that Carruth was only convicted of the offense of making false statements to FBI agents. He is not being sentenced for any bribery-related offenses or for his sexual harassment and abuse of the many women who have spoken up against him at great personal risk. He is instead being sentenced for lying about his misconduct.

Nevertheless, the conduct that Carruth tried to hide from FBI agents was appalling. As Emily Abbott of the JDDC described eloquently in her letter to the Court, Carruth

> had both the experience and the training to preside over criminal prosecutions involving law enforcement witnesses. He was tasked with judging the credibility of law enforcement officers in his court. He understood the implications of lying. Yet, he drove to Clarendon to Little Rock and proactively deceived law enforcement to the potential detriment of another person.

Gov. Sent. Ex. I at 2.

Carruth's lies, and the conduct he sought to cover up by telling them, also had a victim: Courtney Mason. As Mason put it in her letter to the Court,

11

[Carruth], in a position of power, sexualized me, and after being rejected and reported proceeded to try and intimidate me with police. Slandered me online and to anyone who would listen in our small town. Tried to scare me out of testifying. I am someone's daughter, granddaughter, mother, aunt, sister and friend. A survivor of childhood sexual abuse, to now a grown woman with a voice, that you have tried to silence ever since I reported your unfathomable behavior. I in no way deserved to be sexualized by you. A man I had gone to for legal help many times . . . [I] suffer from PTSD, severe anxiety and depression which has worsened over the past 3 years, dealing with the former judge. So much so that there are days I can't even leave my home. Constantly looking over my should in fear.

Gov. Ex. J at 1–2.

Carruth then chose to compound his crimes by repeatedly testifying falsely at trial, as explained in detail above. And he retaliated against those who investigated him, sought to testify against him, or otherwise criticized him—including government counsel and agents of the FBI—by accusing *them* of engaging in misconduct or otherwise speaking poorly of them. That pattern revealed his vindictiveness and an utter lack of remorse for his own misconduct. In his view, those who stood against him were biased, lying, or criminals, but he himself did nothing wrong.

But beyond the offense conduct, the Court must also look to Carruth's demonstrated pattern of predatory behavior and the devastation that he left in his wake. A sentencing court can and should consider uncharged, relevant conduct when imposing a sentence in order to fully understand the scope of the defendant's conduct. *United States v. Watts*, 519 U.S. 148, 151–52 (1997) (internal citations omitted) ("Highly relevant-if not essential [to the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."). The Court may rely on such uncharged relevant conduct to enhance a sentence imposed within statutory limits. *United States v. Mustafa*, 695 F.3d 860, 862 (8th Cir. 2012). That includes conduct did not result in a conviction or is beyond the reach of federal jurisdiction. *See Nichols v. United States*, 511 U.S. 738, 747 (1994). Carruth's continuous abuse of his position—as a private attorney, a prosecutor, and an elected-judge—for his own sexual gratification falls into

12

that category. *See* Section I.A; Gov. Sent. Exs. A-D and I. The evidence shows that Carruth preyed on and exploited numerous, vulnerable women caught up in the criminal justice system—either as defendants or family members of defendants—over many years. That pattern that no doubt would have continued had Mason not had the smarts and courage to record her April 18 meeting with Carruth.

In addition, as the government previewed to the Court during trial, there is significant evidence that Carruth covertly recorded his step-daughter in his home—both in the bathroom and in her bedroom—while she was nude. Two such recordings were recovered from his devices. Moreover, contrary to Carruth's statements that he undertook his "investigation" into Mason to protect the integrity of his chambers, there is significant and graphic evidence—in the form of text messages and photographs—showing that Carruth engaged in a secret affair with an employee who worked in his chambers. *See* Gov. Sent. Ex. F. Both discoveries demonstrate the depth of Carruth's dishonesty with the FBI and the Court during trial. It also further evidences Carruth's willingness to use his position of trust for his sexual gratification and to do what he needed to do to conceal his unethical, immoral, and—with respect to the recordings of his step-daughter—possibly criminal behavior.

Thus, Carruth's history and characteristics, along with the nature and circumstances of the offense, fully support the government's recommended sentence of 18 months incarceration.

**B. Seriousness of the Offense, Promoting Respect for the Law, Just Punishment, and Adequate Deterrence**

The need for the sentence to reflect the gravity of Carruth's historical and relevant pattern of misconduct and the offense of conviction, promote respect for the law, and provide a just punishment serves to further support imposing a significant sentence of imprisonment.

Given the positions that Carruth held throughout his career and his lack of criminal history, one would think there would be no concern regarding his respect for the law. But the JDDC investigation, the underlying federal investigation in this case, the sheer brazenness of the count of conviction, and—perhaps most of all—Carruth's conduct during trial, establish that Carruth does not believe that the law applies to him. He has steadfastly acted over many years as though his positions of power have licensed him to use those within his grasp to his own ends. And he has left no room for doubt that he viewed this case and this trial as a witch hunt. But while Carruth may never truly respect the law—at least not as it applies to him—a sentence of incarceration may begin to restore the public's confidence in, and therefore respect for, the rule of law in Monroe County.

General deterrence should also be an important factor to the sentencing in this case. It is not often that a former state judge is convicted of a felony—particularly one that represents such a breach of public trust as the count of conviction here. When it happens and it is exposed, it imposes a social cost. That cost is the weakening of the public's faith in government and the criminal justice system, which in turn breeds more cynicism, crime, and corruption. A serious sentence in this case—a sentence of imprisonment—would send an important message: that those in the judiciary, charged with safeguarding our communities and upholding the law, must themselves obey the law.

That Carruth will likely, because of this conviction, never again hold a position of authority which he could use to abuse women should play little role in the fashioning of his sentence. And that, because of his own criminal conduct, "he has lost the right to practice law and, at age 65, has lost most of the resources he had set aside for a comfortable retirement" should afford him no leniency at sentencing. ECF No. 138 at 3–4; *see United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater

14

reputational harm or have more to lose by conviction."); *see also United States v. Morgan*, 635 F. App'x 423, 446 (10th Cir. 2015) ("None of these collateral consequences are properly included in [the] sentence. They impermissibly favor criminals . . . with privileged backgrounds."). That is particularly the case where, as here, the defendant has done *nothing* to address his betrayal of the public trust and the harm that his conduct has caused to both specific victims and the community at large.

## IV.    Conclusion

For these reasons, the United States requests that the Court impose a sentence of 18 months, to be followed by one year of supervised release.

Respectfully submitted,

JONATHAN D. ROSS
United States Attorney
Eastern District of Arkansas

*/s/ Madison H. Mumma*
MADISON H. MUMMA
NICHOLAS W. CANNON
Trial Attorneys
Public Integrity Section
Criminal Division
(202) 913-4794
madison.mumma@usdoj.gov
nicholas.cannon2@usdoj.gov

*/s/ Julie E. Peters*
JULIE E. PETERS
Assistant United States Attorney
U. S. Attorney's Office
Eastern District of Arkansas
(501) 340-2618
julie.peters@usdoj.gov